UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------

BRENDA MELENDEZ, *as parent and natural guardian of J.C.*, and BRENDA MELENDEZ, *individually*,

                           Plaintiff,

                     v.

DAVID C. BANKS, *in his official capacity as the Chancellor of the New York City Department of Education*, and the NEW YORK CITY DEPARTMENT OF EDUCATION,

                           Defendants.

**MEMORANDUM & ORDER**
21-CV-1243 (MKB)

---------------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Brenda Melendez, individually and on behalf of her minor child, J.C., brings this action against David C. Banks,[1] in his official capacity as the Chancellor of the New York City Department of Education, and the New York City Department of Education ("DOE"), seeking declaratory and reimbursement relief pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*. (Compl., Docket Entry No. 1.) Plaintiff seeks review and reversal of the State Review Officer's ("SRO") order, which overturned the Impartial Hearing Officer's ("IHO") decision granting Plaintiff reimbursement for private school pursuant to IDEA. (*Id.* at ¶¶ 49–52.) Plaintiff moves for summary judgment on her claims and Defendants

---

    [1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the caption has been updated to reflect the new Chancellor. David C. Banks, Chancellor of the New York City Department of Education, is automatically substituted for Meisha Porter.

cross-move for summary judgment.[2] For the reasons set forth below, the Court denies Plaintiff's motion and grants Defendants' cross-motion.

I. **Background**

    a. **Statutory framework for IDEA cases**

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 223 (2d Cir. 2012) (alteration in original) (quoting 20 U.S.C. § 1400(d)(1)(A)-(B)); *A.R. v. Conn. Bd. of Educ.*, 5 F.4th 155, 157 (2d Cir. 2021). The IDEA mandates that a "state receiving federal funds under the IDEA must provide disabled children with a free and appropriate public education ('FAPE')." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174–75 (2d Cir. 2012) (citation omitted); *see also Mendez v. Banks*, 65 F.4th 56, 59 (2d Cir. 2023). The goal of the IDEA is "[t]o ensure that qualifying children receive a FAPE." *R.E.*, 694 F.3d at 175. To do so, it mandates that "a school district must create an individualized education program ('IEP') for each [disabled] child." *Id.*; *see also* 20 U.S.C. § 1414(d); *Mendez*, 65 F.4th at 59. "The IEP is 'a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *R.E.*, 694 F.3d at 175 (quoting *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006)); *see also Ventura De Paulino v. N.Y.C. Dep't*

---

[2] (Pl.'s Mot. for Summary J. ("Pl.'s Mot."), Docket Entry No. 26; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), Docket Entry No. 27; Defs.' Mot. for Summary J. ("Defs.' Mot."), Docket Entry No. 28; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 30; Pl.'s Mem. in Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), Docket Entry No. 31; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 32.)

*of Educ.*, 959 F.3d 519, 523 n.1 (2d Cir. 2020) (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012)).  The IEP is required to be "reasonably calculated to enable the child to receive educational benefits."  *R.E.*, 694 F.3d at 175 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)); *M.H.*, 685 F.3d at 224 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007)) (same); *see also Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017); *Doe v. E. Lyme Bd. of Educ.*, 962 F.3d 649, 663 (2d Cir. 2020).  "Under the IDEA, for a child's IEP to be adequate, it must be likely to produce progress, not regression, and [must] . . . afford[ ] the student with an opportunity greater than mere trivial advancement."  *A.H. ex rel. J.H. v. Dep't of Educ.*, 394 F. App'x 718, 721 (2d Cir. 2010) (quoting *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009); *M.H.*, 685 F.3d at 224 (same).  However, the IDEA does not require the IEP to "furnish every special service necessary to maximize each handicapped child's potential."  *A.H. ex rel. J.H.*, 394 F. App'x at 721 (citations omitted).

"In New York, the state has assigned responsibility for developing IEPs to local Committees on Special Education ('CSEs')."  *R.E.*, 694 F.3d at 175 (first citing N.Y. Educ. Law § 4402(1)(b)(1); and then citing *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998)); *see also Bd. of Educ. v. C.S.*, 990 F.3d 152, 155 (2d Cir. 2021) (citing N.Y. Educ. Law § 4402(1)(b)(1)).  "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others."  *R.E.*, 694 F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)); *see also C.S.*, 990 F.3d at 156 ("Generally, a child's CSE includes the child's parents, some of the child's teachers, a school district representative, and a school psychologist." (first citing N.Y. Educ. Law § 4402(1)(b)(1)(a); and then citing N.Y.

3

Comp. Codes R. & Regs. Tit. 8, § 200.3(a)(1)(i)–(x))). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175 (citing *Gagliardo*, 489 F.3d at 107). "If a parent believes that his child's IEP does not comply with the IDEA, the parent may file a 'due process complaint' (a type of administrative challenge unrelated to the concept of constitutional due process) with the appropriate state agency." *R.E.*, 694 F.3d at 175 (citing 20 U.S.C. § 1415(b)(6)); *see also M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013). The due process complaint is heard by an IHO, 20 U.S.C. § 1415(f); *R.E.*, 694 F.3d at 175; *M.H.*, 685 F.3d at 224, appointed by the local board of education, *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (citing N.Y. Educ. Law § 4404(1)). A party can appeal the IHO's decision to the SRO. *R.E.*, 694 F.3d at 175; *see also* N.Y. Educ. Law § 4404(2); *M.W. ex rel. S.W.*, 725 F.3d at 135.

After the SRO has rendered a decision, a party can "then bring a civil action in state or federal court to review the SRO's decision." *R.E.*, 694 F.3d at 175 (citing 20 U.S.C. § 1415(i)(2)(A)); *see also M.W. ex rel. S.W.*, 725 F.3d at 135–36. "When such an action is brought in federal district court, the court reviews the records of all of the prior administrative hearings and must hear additional evidence if so requested by either of the parties." *M.H.*, 685 F.3d at 225 (citing 20 U.S.C. § 1415(i)(2)(c)).

"Parents who are dissatisfied with their child's education can 'unilaterally change their child's placement during the pendency of review proceedings' by paying for private schooling 'at their own financial risk.'" *Ventura De Paulino*, 959 F.3d at 526 (quoting *Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373–74 (1985)). After the IEP dispute is resolved, a parent may obtain retroactive reimbursement for a unilateral placement if they satisfy

4

the criteria of the three-part *Burlington-Carter* test. *Ventura De Paulino*, 959 F.3d at 526; *M.W. ex rel. S.W.*, 725 F.3d at 135; *R.E.*, 694 F.3d at 185. First, the school board must establish that the IEP was appropriate both procedurally and substantively. *R.E.*, 694 F.3d at 189–90; *see also Walczak*, 142 F.3d at 129. An IEP is appropriate substantively if the "IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07); *see also A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009); *F.L. ex rel. F.L.*, 2012 WL 4891748, at *6. If the school board fails to carry its burden, the next step in the test requires the parents of the child to establish the appropriateness of the private school placement. *R.E.*, 694 F.3d at 185 (citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)); *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ., (Region 4)*, 526 F. App'x 135, 139 n.5 (2d Cir. 2013). Lastly, the parents must establish that the equities favor reimbursement of the private school education and the level of reimbursement. *R.E.*, 694 F.3d at 185 (citing *Cerra*, 427 F.3d at 192); *P.K. ex rel. S.K.*, 526 F. App'x at 139 n.5.

      b.   **J.C.'s individual background**

J.C. was a ten-year-old boy during the 2019–2020 school year. (Pl.'s 56.1 ¶ 2, Docket Entry No. 25.) He has been diagnosed with multiple impairments, including quadriplegic cerebral palsy, epileptic seizures, and cortical vision impairment. (*Id.* ¶ 3.) J.C. has brain injury and global development delay, and is dependent on help from adults for all activities of daily living. (*Id.* ¶¶ 4, 6.) He is nonverbal, non-ambulatory, uses a wheelchair for mobility, and communicates with others using facial expressions, head-turning to activate the assistive technology switch for verbal prompting, and vocalizations. (*Id.* ¶¶ 4, 5.) J.C. is both a New York City resident and a child with a disability and is therefore entitled to a FAPE pursuant to IDEA. (*Id.* ¶ 9.)

### c. May 30, 2019 CSE meeting

In February of 2019, the DOE contacted Plaintiff to schedule a CSE meeting to develop an IEP for J.C. for the 2019–2020 school year. (Certified Admin. R. ("R.") 3, Docket Entry No. 15.) Plaintiff responded by letter on February 19, 2019, and requested that a DOE physician participate in the meeting in person. (Pl.'s 56.1 ¶ 17; R. 3.) The CSE meeting was held on May 30, 2019.[3] (R. 3.) Plaintiff attended the meeting but subsequently refused to participate upon learning that the DOE physician would appear by telephone and not in person. (R. 3.) The CSE continued the meeting without Plaintiff. (R. 3–4.) The CSE reviewed J.C.'s records and evaluations and recommended placement in a 12:1:4 class[4] with individual occupational therapy four times per week for thirty minutes; individual physical therapy five times per week for thirty minutes; individual speech and language therapy five times per week for sixty minutes; an individual health and transportation paraprofessional; and an iPad/Snap Communication device. (R. 4.) The DOE assigned J.C. to "Chelsea Prep." (R. 4.) Plaintiff did not visit the school to observe the placement. (R. 4.) On June 21, 2019, Plaintiff advised the DOE that she intended to place J.C. at iBrain, a private school, for the 2019–2020 school year. (Pl.'s 56.1 ¶ 23.)

### d. The IHO's decision

On July 8, 2019, Plaintiff filed a due process complaint alleging that DOE denied J.C. a FAPE for the 2019–2020 school year. (*Id.* ¶ 25.) Plaintiff notified DOE that she was seeking funding for J.C.'s placement at iBrain, including special education transportation. (*Id.*) IHO

---

[3] Plaintiff's 56.1 indicates that the CSE meeting was held on May 20, 2019, however the record indicates that the meeting was held on May 30, 2019. (*See, e.g.*, R. 386, 818.)

[4] The parties use "12:1:4 class" and "12:1(3+1) class" interchangeably — both refer to a class composed of twelve students, one special education teacher, and one special group paraprofessional for every three students. The Court uses "12:1:4."

James McKeever held a hearing on June 29, 2020.  (*Id.* at ¶¶ 27, 29.)  On August 30, 2020, the IHO issued a nine-page, double-spaced decision in which he concluded that (1) DOE denied J.C. a FAPE during the 2019–2020 school year, (2) Plaintiff's placement of J.C. at iBrain was appropriate, and (3) equitable considerations weighed in favor of full reimbursement to Plaintiff of the cost for J.C. to attend iBrain.  (*Id.* ¶ 29; R. 1–9.)  The IHO found that "the proposed 12:1:3+1 class was too large to meet the student's individual needs," that "the ratio of 1 teacher to 12 students was not sufficiently restrictive to provide the level of services that this student requires," and that "although the DOE's proposed placement included additional support staff, this fact would not compensate for the fact that there was only 1 teacher for 12 students."  (R. 6.)  Regarding Plaintiff's "alleged procedural violations" — such as the DOE physician's failure to attend the CSE meeting in person — the IHO concluded that they "were *de minimis*" and "d[id] not rise to a denial of FAPE."[5]  (R. 6–7.)  On October 9, 2020, DOE appealed the IHO's decision, arguing that the IHO erred in determining (1) that DOE failed to offer J.C. a FAPE for the 2019–2020 school year, (2) that Plaintiff's placement of J.C. at iBrain was appropriate, and (3) that the equities supported full reimbursement.  (Pl.'s 56.1 ¶ 31; R. 850–59.)  On October 16, 2020, Plaintiff submitted a verified answer in opposition.  (Pl.'s 56.1 ¶ 32; R. 863–72.)

    e.   **The SRO's decision**

On November 6, 2020, SRO Steven Krolak reversed the portion of the IHO's decision finding that DOE did not offer J.C. a FAPE for the 2019–2020 school year.  (Pl.'s 56.1 ¶ 33; R. 832.)  In a 17-page, single-spaced decision, the SRO analyzed J.C.'s IEP in depth and concluded

---

[5] Plaintiff claimed that the "district significantly impeded [her] opportunity to participate in the decision-making process regarding the provision of a FAPE," failed to hold the May 2019 annual review meeting at a time "agreeable" to Plaintiff, and failed to hold a "full committee meeting including a school physician and parent member."  (R. 819.)  Plaintiff does not raise these procedural challenges in this action.  (*See* Pl.'s Opp'n 9.)

7

that DOE's recommendation of a 12:1:4 class size was appropriate under the relevant laws. (R. 825–832.) The SRO noted that J.C.'s "highly intensive needs" were not in dispute, as was indicated by J.C.'s IEP which "included a significant number of management supports and strategies to address those needs," including "full time 1:1 paraprofessional services to address [J.C.'s] health and safety needs." (R. 831.) The SRO concluded that Plaintiff's "strict adherence to the language in [s]tate regulation guiding [6:1:1] special class placements to the exclusion of other appropriate placement options is reductive and overlooks that [J.C.'s] highly intensive needs were due to his severe multiple disabilities, and that a program consisting of habilitation and treatment was appropriate to meet [J.C.'s] needs." (R. 832.)

On March 8, 2021, Plaintiff filed a complaint challenging the SRO's decision to this Court. (Pl.'s 56.1 ¶ 34.)

## II. Discussion

### a. Standard of review

Summary judgment in this context is effectively an appeal of the State's decision. *R.E.*, 694 F.3d at 184 ("Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." (quoting *A.C. ex rel. M.C.*, 553 F.3d at 171)); *see also C.S.*, 990 F.3d at 165 ("In a district court proceeding under the IDEA, the parties and the court typically style the decision as a ruling on a motion for summary judgment, but 'the procedure is in substance an appeal from an administrative determination, not a summary judgment motion.'" (quoting *M.H.*, 685 F.3d at 226)). "A reviewing court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *M.H.*, 685 F.3d at 240 (citations and internal quotation marks omitted); *see also C.S.*, 990 F.3d at 165 (quoting *M.H.*,

685 F.3d at 240); *R.E.*, 694 F.3d at 184 ("A federal court reviewing a dispute over an IEP must base its decision on the preponderance of the evidence." (quoting *A.C. ex rel. M.C.*, 553 F.3d at 171)). However, a federal court reviewing the administrative decision "must defer to the administrative decision because 'the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *R.E.*, 694 F.3d at 184 (quoting *A.C. ex rel. M.C.*, 553 F.3d at 171); *see also C.S.*, 990 F.3d at 165; *M.W. ex rel. S.W.*, 725 F.3d at 135 ("In undertaking this independent review, we are further restrained by our lack of specialized knowledge and educational expertise; we must defer to the administrative decision [particularly where] the state officer's review has been thorough and careful." (alterations in original) (internal quotation marks omitted) (quoting *Walczak*, 142 F.3d at 129)). "District courts are not to make 'subjective credibility assessment[s],' and cannot 'ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence.'"[6] *M.H.*, 685 F.3d at 240 (alteration in original) (quoting *Grim*, 346 F.3d at 383).

---

[6] The Second Circuit has given examples of when an opinion of the SRO should be given more or less deference:
> By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

9

The Second Circuit has held that deference "is particularly appropriate" where the state administrative review "has been thorough and careful." *P. v. West Hartford Bd. of Educ.*, 885 F.3d 735, 754 (2d Cir. 2018) (citing *M.H.*, 685 F.3d at 241); *Walczak*, 142 F.3d at 129. "The SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference." *M.H.*, 685 F.3d at 241 (quoting *Gagliardo*, 489 F.3d at 114). The Supreme Court and this Circuit have noted that a federal court's independent review is something between *de novo* review and "limited . . . review for state compliance with the Act's procedural requirements [with] no power to review the substance of the state program." *M.H.*, 685 F.3d at 241–42 (quoting *Rowley*, 458 U.S. at 205); *see also C.F.*, 746 F.3d at 77 ("The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'" (quoting *M.H.*, 685 F.3d at 244)).

"If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." *M.H.*, 685 F.3d at 241 (quoting *A.C. ex rel. M.C.*, 553 F.3d at 171); *see also C.S.*, 990 F.3d at 165. "Where the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 147 (2d Cir. 2019) (quoting *M.H.*, 685 F.3d at 246); *see also M.W. ex rel. S.W.*, 725 F.3d at 139 ("Where an SRO has clearly demonstrated a better command of the record and supported her conclusions through better legal and factual analysis than an IHO, we will have

---

*M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (citations omitted); *see also J.D. v. Rye Neck Union Free Sch. Dist.*, 22-CV-3039, 2023 WL 1797170, at *9 (S.D.N.Y. Feb. 7, 2023) (same).

10

little difficulty deferring to the SRO's opinion."); *T.L. v. N.Y.C. Dep't of Educ.*, 938 F. Supp. 2d 417, 432 (E.D.N.Y. 2013) ("When, as in the present case, the IHO and SRO disagree, the general rule is that courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." (internal quotation marks omitted) (quoting *R.E.*, 694 F.3d at 189)).

### b. The SRO's decision was reasoned and supported by the record

In support of her motion for summary judgment, Plaintiff makes several arguments. First, she argues that that the SRO erred in determining that DOE offered J.C. a FAPE for the 2019–2020 school year. (Pl.'s Mem. 9–14.) In support, she contends that: (1) the SRO erred in determining that DOE offered J.C. a FAPE for the 2019–2020 school year, (*id.*) because pursuant to New York law, students with "highly intensive" management needs "must be given a classroom placement with no more than six students per teacher," (*id.* at 9); (2) the SRO erroneously "trie[d] to create a distinction between 'direct instruction' and '1:1 instruction,'" and mistakenly concluded that the record did not support Plaintiff's "connection between 1:1 instruction and direct instruction," (*id.* at 11); (3) the SRO's reasoning that "the extra paraprofessionals and aids in the 12:1:4 class can make up for any lack of direct, individual educational instruction" fails to recognize that "in a 6:1:1 class, J.C. will receive *twice as much* one-on-one time *with his special education teacher* as he would in a 12:1:4 class," (*id.* at 11–12); (4) "J.C.'s need for constant monitoring and help with activities of daily living are adequately addressed by *his* 1:1 *paraprofessional along with the class paraprofessional* in a 6:1:1 placement, (*id.* at 13); and (5) the "caselaw is clear that a paraprofessional cannot substitute for a teacher in educating students," and therefore the SRO's reasoning was flawed, (*id.* at 12–13). Second, Plaintiff argues that her placement of J.C. at iBrain was appropriate, and because

11

the SRO did not reach this issue, the Court should defer to the IHO's decision. (*Id.* at 14–15.) Third, Plaintiff contends that the equities favor reimbursement and because the SRO also did not reach this issue, the Court should defer to the IHO's decision. (*Id.* at 15–16.) Fourth, Plaintiff argues that the Court should give less deference to the SRO's decision since it hinges on a question of law rather than one of education policy, and district courts need not defer to an SRO decision where "the questions presented are matters of law and legal interpretation of a statute." (*Id.* at 17.) Fifth, Plaintiff argues that the Court should defer to the IHO's decision since the Second Circuit has held that where an SRO's conclusions are inadequately reasoned, courts should defer to the IHO's analysis.[7] (*Id.* at 18.)

Defendants argue that the Court should deny Plaintiff's motion because the SRO correctly held that DOE offered J.C. a FAPE for the 2019–2020 school year, (Defs.' Mem. 11), and therefore he properly abstained from determining whether Plaintiff's placement of J.C. at iBrain was appropriate and whether the equities weighed in favor of reimbursement, (*id.* at 16–18). In support, Defendants contend that the SRO conducted "a thorough analysis and review of the record" to conclude that J.C.'s 2019–2020 IEP recommendation was appropriate, (*id.* at 15), and that he properly affirmed DOE's recommendation of a 12:1:4 class for J.C. on the basis that, under the applicable regulations, "the maximum class size [for] students with severe multiple disabilities, whose programs consist primarily of habilitation and treatment, shall not exceed 12 students" and that in addition to the teacher, the staff–student ratio should not be less than "one

---

[7] Plaintiff has not raised any procedural challenges to the SRO's determination and the Court therefore declines to address whether the CSE made any procedural errors when determining J.C.'s IEP. (*See* Pl.'s Opp'n 9–10 ("Defendants assert that Plaintiff argued in [her] Motion for Summary Judgment that there were three procedural violations of the IDEA . . . . Yet [Plaintiff] did not make these arguments in [her] Motion for Summary Judgment . . . . These procedural mishaps may have been mentioned briefly in the Statement of Facts, but other than that, these issues are not even so much as noted in [Plaintiff's] argument.")).

staff person to three students and that these staff persons may be teachers, supplementary school personnel, and/or related services providers," (*id.* at 16). Defendants also argue that Plaintiff waived or abandoned any issues not raised in the due process complaint. (*Id.* at 18–19.)

The SRO's decision is reasoned and supported by the record. The SRO first determined that J.C. had been diagnosed with, *inter alia*, "epileptic seizure disorder, quadriplegic cerebral palsy, neuromuscular scoliosis, dysphagia and cortical vision impairment." (R. 817.) Based on these diagnoses, the SRO categorized J.C. as having "severe multiple disabilities."[8] (R. 825.) The applicable state regulation provides that "[t]he maximum class size for those students with severe multiple disabilities, whose programs consist primarily of habilitation and treatment, shall not exceed [twelve] students. In addition to the teacher, the staff/student ratio shall be one staff person to three students. The additional staff may be teachers, supplementary school personnel and/or related service providers." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(h)(4)(iii). This ratio of student/teacher/staff is referred to with the shorthand "12:1:4" or "12:1:(3+1)." Based on J.C.'s classification as a student with "severe multiple disabilities," the SRO determined that a 12:1:4 class was the maximum classroom size that J.C. could be assigned to pursuant to the IDEA and state law.[9] The SRO therefore concluded that the hearing record supported DOE's decision to recommend a 12:1:4 special class for J.C. (R. 832.)

---

[8] The IHO also found that J.C. should be classified as having severe "multiple disabilities" under the IDEA. (R. 2.)

[9] In reaching this conclusion, the SRO relied in part on the testimony of DOE psychologist Charisma Marius. At the IHO hearing, Ms. Marius testified that various classrooms such as those with a 6:1:1, 8:1:1, and 12:1:1 teacher/student/support staff ratio were "inappropriate" for J.C. "because J.C. required a smaller student-teacher ratio due to his severe cognitive and motor limitations" and that the "12:1:4 [classroom] is considered . . . one of our most restrictive in a specialized school program [and] is . . . highly intensive and supporting [for] students with severe cognitive and medical needs." (R. 175–76, 219.)

13

The SRO's conclusion, which was supported by a seventeen-page, single spaced analysis, was "thorough and careful," supported by the record and relevant law, and is entitled to deference. *R.E.*, 694 F.3d at 184 (noting that a federal court reviewing an administrative decision "must defer to the administrative decision because 'the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy'" (quoting *A.C. ex rel. M.C.*, 553 F.3d at 171)); *see also P.*, 885 F.3d at 754 (noting that deference "is particularly appropriate" where the state administrative officer's review "has been thorough and careful, and when the court's decision is based solely on the administrative record" (citing *M.H.*, 685 F.3d at 241)); *B.D. v. Eldred Cent. Sch. Dist.*, --- F. Supp. 3d ---, ---, 2023 WL 3025308, at *8 (S.D.N.Y. Apr. 20, 2023) (deferring to the SRO's decision and noting that the "[t]he Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when . . . the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when . . . the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when . . . the district court's decision is based solely on the administrative record that was before the SRO." (citation omitted)).

Moreover, the Second Circuit's summary order in *Carrillo* — decided after the parties briefed their motions — further supports the SRO's analysis.[10]  *Carrillo v. N.Y.C. Dep't of*

---

[10]  On June 23, 2023, the Court directed the parties to file letters explaining the impact of *Carrillo v. New York City Department of Education*, No. 21-CV-2639, 2023 WL 3162127 (2d Cir. May 1, 2023), on this case. (*See* Order dated June 23, 2023.)  Plaintiff argues that *Carrillo* (1) is a summary order and therefore non-precedential, (Pl.'s July 5, 2023 Letter 1, Docket Entry No. 39); (2) "did not set forth sufficient facts to determine its applicability" since it "deferred in general terms to the conclusion[] of the SRO" that a 12:1:4 classroom met the individual student's unique needs and therefore is not applicable J.C.'s unique needs, (*id.*); (3) is distinguishable since the SRO drew "an artificial distinction" between "direct instruction" and

*Educ.*, No. 21-CV-2639, 2023 WL 3162127 (2d Cir. May 1, 2023). In *Carrillo*, the parents of a non-verbal and non-ambulatory student with significant disabilities challenged a DOE IEP which classified their child's disability as severe "multiple disabilities" and recommended that the child be placed in a 12:1:4 classroom — "the most supportive classroom environment contemplated by the applicable New York regulations." *Carrillo*, 2023 WL 3162127, at *1. The plaintiffs objected to the proposed placement, notified DOE that they intended to place the child at iBrain, and filed a due process complaint arguing that the child had both "highly intensive needs" *and* "severe multiple disabilities" and required placement in a 6:1:1 classroom. *Id.* at *3. The IHO, SRO, and district court all affirmed the CSE's determination that the child had "severe multiple disabilities" and should be placed in a 12:1:4 classroom. *Id.* at *2–3. On appeal, the Second Circuit affirmed the decisions of the CSE, IHO, SRO, and district court that a 12:1:4 classroom was the appropriate placement for a child diagnosed as having "severe multiple disabilities." *Id.* at *3–4. The Court noted that the regulatory framework lays out a "continuum of services" under which "each successive category of classroom [provides an] increasing . . . level of support." *Id.* at *2. The Court found that under "the continuum of classroom options, the 12:1:4 is the *most* supportive classroom available," and that students "whose needs justify placement in a high-support classroom" such as a 12:1:4 class "would also be expected to have needs sufficient for placement in a lower-support classroom" such as a 6:1:1 class. *Id.* at *3. Since the child had both "severe multiple disabilities," which require placement in the most supportive

---

"1:1 instruction" when Plaintiff requested both, (*id.* at 2); and (4) is distinguishable since it did not involve a conflict between the IHO and SRO's opinions, (*id.* at 2–3). Defendants argue that "[t]he instant case is on all fours with *Car[r]illo*," and that therefore the Court should grant their motion for summary judgment based on the holding in *Carrillo*. (Def.'s July 5, 2023 Letter 1–3, Docket Entry No. 37.)

15

classroom on the continuum, and "highly intensive management needs," for which a less supportive environment is appropriate, the Court concluded that the CSE did not err in assigning the child to the classroom setting required by her most serious diagnosis. *Id.* The Court concluded that the "CSE met its obligation to carefully consider the student's needs," "developed a plan that would provide her with a FAPE," and properly assigned her to a 12:1:4 classroom as the regulation requires for children with severe multiple disabilities. *Id.* at *3. The Court also found that the parents' argument that "because [the child] has highly intensive management needs she *requires* a 6:1:1 classroom" was "not supported by the plain language of the regulation." *Id.*

In this case, as in *Carrillo*, the SRO also determined that pursuant to section 200.6(h)(4)(iii), a 12:1:4 classroom is the appropriate placement for a student with "severe multiple disabilities" and that Plaintiff's preference that J.C. be placed in a 6:1:1 classroom was not controlling. (R. 832.)

### i. The IHO's decision is not entitled to deference

The IHO's decision is not better reasoned than the SRO's decision and is therefore not entitled to deference. Like the SRO, the IHO found that J.C. is classified as suffering from severe "multiple disabilities" under the IDEA, including "a brain injury[,] . . . cerebral palsy, epileptic seizure disorder and cortical vision impairment." (R. 2.) However, the IHO concluded that instead of being assigned to a 12:1:4 classroom as required by section 200.6(h)(4)(iii), J.C. should instead be placed in a 6:1:1 classroom.[11] (R. 6.) In his nine-page, double-spaced

---

[11] Under the regulatory scheme, a 6:1:1 classroom is the maximum class size for students whose management needs are determined to be "highly intensive." *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(h)(4)(ii)(a) ("The maximum class size for special classes containing students whose management needs are determined to be highly intensive, and requiring a high degree of

16

decision, the IHO found that the district's proposed 12:1:4 placement was "not sufficiently restrictive to provide the level of services that [J.C.] requires to obtain an educational benefit from instruction" since "the ratio of [one] teacher to [twelve] students" was "too large to meet [J.C.'s] individual needs." (R. 6.) The IHO did not explain why he believed a 6:1:1 classroom — which is less supportive than the 12:1:4 classroom to which J.C. was assigned, *see Carrillo*, 2023 WL 3162127, at *1 — was more "appropriate" for J.C. other than to note that although the 12:1:4 classroom "included additional support staff, this fact would not compensate for the fact that there was only [one] teacher for [twelve] students." (R. 6.) The IHO failed to address Ms. Marius's testimony that special group class paraprofessionals are "trained to provide instruction to the students," and therefore a 12:1:4 classroom is more supportive than a 6:1:1 classroom, because in the 12:1:4 classroom the ratio of students to individuals trained to provide instruction is twelve to five (i.e. twelve students to one teacher, plus four paraprofessionals) while in a 6:1:1 classroom the ratio is six to two (six students to one teacher and one paraprofessional). (R. 192, 201–02, 210–11.) Because the IHO did not explain why he believed J.C. should be assigned to a 6:1:1 classroom, which is less supportive than the 12:1:4 classroom required by section 200.6(h)(4)(iii), *see Carrillo*, 2023 WL 3162127, at *1, his decision is not well reasoned or entitled to deference. *See W.A.*, 927 F.3d at 147 ("Where the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." (quoting *M.H.*, 685 F.3d at 246)).

---

individualized attention and intervention, shall not exceed six students, with one or more supplementary school personnel assigned to each class during periods of instruction.").

### ii. Plaintiff's preferred placement is not entitled to deference

Plaintiff's arguments as to why a 6:1:1 class would better suit J.C. do not warrant deference. Plaintiff argues that J.C. will be better placed in a 6:1:1 class where J.C. "will receive twice as much one-on-one time with his special education teacher," (Pl.'s Mem. 11–12), and that in a 12:1:4 class J.C. could potentially be in a class of twenty-nine individuals (twelve students, twelve individual paraprofessionals, four special group paraprofessionals, and one teacher), which is too large for J.C.'s need for "small group instruction and direct 1:1 time with his special education teacher," (Pl.'s Opp'n at 7–8). However, as discussed above, section 200.6(h)(4)(iii) provides that the maximum class size for students with severe multiple disabilities such as J.C. is a 12:1:4 classroom. Plaintiff's desired placement of J.C. in a 6:1:1 classroom does not conform to section 200.6(h)(4)(iii)'s requirement that students with J.C.'s disability be placed in a class with a *maximum* student/teacher/staff ratio of 12:1:4. The SRO affirmed J.C.'s placement in a 12:1:4 classroom pursuant to section 200.6(h)(4)(iii), and Plaintiff's preference for another placement is not entitled to deference. *See Carrillo*, 2023 WL 3162127, at *3 (noting that a student's parents' "*preference* for a different placement is not controlling" since the IDEA "guarantees . . . an 'appropriate' education, 'not one that provides everything that might be thought desirable by loving parents" (quoting *Walczak*, 142 F.3d at 132)); *Carrillo v. Carranza*, No. 20-CV-4639, 2021 WL 4137663, at *17 (S.D.N.Y. Sept. 10, 2021) (noting that the decision of whether a 6:1:1 or 12:1:4 classroom is more appropriate for a child with severe multiple disabilities "is precisely the sort of decision that a person like the SRO, who has extensive experience in the education of profoundly disabled children, is equipped to make — and that this court is ill-equipped to second guess"), *aff'd sub nom. Carrillo*, 2023 WL 3162127.

The Court affirms the SRO's decision finding that DOE did not err in recommending that

J.C. be placed in a 12:1:4 classroom setting, and finds that Defendants offered J.C. a FAPE for the 2019–2020 school year.[12]

### III. Conclusion

For the reasons discussed above, Plaintiff's motion for summary judgment is denied and Defendants' cross-motion for summary judgment is granted.

Dated: September 26, 2023
      Brooklyn, New York

SO ORDERED:

          s/ MKB
MARGO K. BRODIE
United States District Judge

---

[12] Because the Court finds that J.C. was offered a FAPE, it does not reach Plaintiff's remaining arguments regarding (1) whether Plaintiff's placement of J.C. at iBrain was appropriate, and (2) whether the equities favor reimbursement. (Pl.'s Mem. 14–16.)